[No. 895-3.   Division Three.   July 11, 1974.]

THE STATE OF WASHINGTON, *Respondent*, v. GEORGE ELMER BUTLER, *Appellant*.

*John D. MacDougall,* for appellant (appointed counsel for appeal).

*Fred L. Stewart, Prosecuting Attorney,* for respondent.

MUNSON, J.—Defendant appeals from a judgment and sentence entered upon a jury verdict of guilty for the crimes of robbery and attempted rape.

Defendant assigns error to: (1) The trial court's failure to grant his motion for change of venue because of alleged

prejudicial pretrial publicity; (2) alleged improper pretrial photographic identification; and (3) an alleged inflammatory statement made by a prosecution witness.

The crime occurred on November 13, 1972, beginning at the Clayton Market in the town of Clayton, Washington, a small community in Stevens County near the Spokane County boundary. An article on the front page of the Chewelah Independent, a newspaper published in Chewelah, Stevens County, Washington, dated Thursday, November 16, 1972, vividly recited the State's case:

Robbery, Abduction at Clayton
        By Bina G. Luiten
    A warrant has been issued for the arrest of George Butler, 39, of Mead, in connection with the armed robbery of the Clayton Market Monday and the abduction of the owner reports Stevens County Sheriff Chan St. Clair.
    Butler is alleged to have robbed the store at about 4 p.m. Monday, taking the owner, Mrs. Margaret Tobeck, as hostage to a wooded area near Jump Off Joe Lake. He held her for some two hours during which time he choked her twice into unconsciousness. He then changed his mind about killing her she said and returned her to Clayton.
    Stevens County sheriff's officers worked all night long on clues said Sheriff St. Clair finding that the robber had been working in the Springdale area logging and had just lost his job there. St. Clair expressed his gratitude to Deputies Fred Mataya, Ken Meyer and Jerry Muggas for their cooperation. Butler had been seen in that area prior to the robbery, in a tavern in Springdale.
    His car, a tan 1966 Chevrolet with Oregon license plates, was noticed in both Springdale and Clayton because of its noisy muffler said Sheriff St. Clair.
    From contacts in Springdale the sheriff's department found his name and address in the Mead area and two Stevens County units and one unit from the Spokane Sheriff's office met in Mead and held an all night stakeout said Sheriff St. Clair.
    They discovered Tuesday, through Butler's three teenage stepchildren left at the home, that he had returned after the time of the robbery, had one of his stepsons fix the muffler on the car, and then he and the mother left.

A picture of the suspect, found in the home, was identified by the robbery victim said Sheriff St. Clair. He said Butler, a former Salem, Ore., resident, has a prior arrest record of armed robbery and assault.

The robbery occured [sic] after he had entered the Clayton Market for the second time on Monday, according to Mrs. Tobeck. The first time he purchased two bottles of beer and then a short time later returned and informed her—"this is a stickup lady." He asked for all of the paper money in the till which came to some $90 she said. He then informed her that she was to go in the car with him so that he could "get away easier."

He drove her north on Highway 395 to the Jump Off Joe Lake turnoff and into a wooded area where he attempted to take her life. When he quit choking her, she said he stated: "I can't do it. I can't kill you."

He offered her some coffee he had in the car and "then we made a deal," said the petite 4'11", 100 lb. Mrs. Tobeck. "I said he could keep the money if he would just release me. He agreed to drive me back to Clayton and also said he's [sic] pay me back the money. He had me count it because he said he was starting a job the next day and would mail the money back when he got it."

The robber then drove her back to Clayton intending first to return her to the store but a sheriff's car was parked there so he drove past dropping her off at St. Joseph's Catholic church.

In the meantime family members had discovered the store untended, the till empty and Mrs. Tobeck missing and had notified law enforcement authorities who were searching for her when she returned.

She was taken to Tri-County Hospital in Deer Park for a checkup but did not require hospitalization. She is currently at the Clayton home of her son, Cecil, and is only able to talk in whispers because of her bruised throat.

The Statesman-Examiner, published in Colville, Stevens County, Washington, printed a similar article on its front page November 16, 1972, although more brief in form. The last paragraph of that article stated:

The officers then obtained a picture of Butler, which was then identified by Mrs. Tobeck. Butler was found to have a previous record of armed robbery and assault.

When the picture was identified by the victim, the warrant was issued.

On November 23, 1972, the Statesman-Examiner published a 3-paragraph story, noting the arrest of the defendant on November 18 in the state of Minnesota, the third paragraph concluding:

Butler lists a long record with the law dating back to 1950. He is accused of entering the Clayton Market and robbing and abducting the owner, Mrs. Margaret Tobeck assaulting her and attempted to strangle her before changing his mind and turning her loose.

About December 29, 1972, defendant filed his motion for change of venue, together with affidavits of defendant and one of his counsel and a memorandum of authorities in support thereof. On January 12, 1973, defense counsel filed a supplementary memorandum of authorities in support of that motion.

The motion and affidavits of defendant and his counsel made reference to the three Stevens County newspaper articles referred to above. Defense counsel's affidavit, attached to the motion, stated that he had taken his own poll of some 40 people, 20 in the town of Chewelah, and 20 in the town of Colville. The poll was taken December 20 and 21, 1972. This poll evidenced that 39 of the 40 received or read either the Chewelah Independent or the Colville Statesman-Examiner. Of these 39, 37 remembered reading an article about a robbery and abduction in the Clayton area, while two did not. Only one of 37 remembered the name of the person alleged to have committed the crime. Based upon the article, 20 had an opinion as to whether the individual named was guilty or innocent of the crime, while 17 had no opinion. Of those 20, 18 believed he was guilty, and two believed he was not guilty.

In the supplementary memorandum, defense counsel referred to a continuing series of accounts on the progress of the case over the local radio station, station KCVL. The memorandum contains a list of the dates—from November 14, 1972, through January 1, 1973, upon which that radio

station did broadcast reports on the robbery and assault and the status of the proceeding against defendant Butler. After each date defense counsel gave a short summary of the content of each news report. He stated that the information had been supplied to him by the news director for KCVL.

In defendant's appellate brief, he alleges that in a period of 17 days there were 68 separate stories concerning this matter by this local radio station. Copies of a number of the broadcasts are included as an appendix to his appellate brief. Inasmuch as copies of the radio reports were not before the trial court, we do not consider them, other than hereinafter noted.

There are occasions when the court will have no difficulty in ascertaining that pretrial publicity is of such a prejudicial nature as to be obvious to everyone. *Rideau v. Louisiana,* 373 U.S. 723, 10 L. Ed. 2d 663, 83 S. Ct. 1417 (1963); *People v. Luedecke,* 22 App. Div. 2d 636, 258 N.Y.S.2d 115 (1965); *People v. Martin,* 19 App. Div. 2d 804, 243 N.Y.S.2d 343 (1963); *see Delaney v. United States,* 199 F.2d 107, 39 A.L.R.2d 1300 (1st Cir. 1952). No claim of actual prejudice is made by this defendant.

In reviewing the denial of defendant's motion for change of venue, we must determine whether the trial court abused its discretion. *State v. Braun,* 82 Wn.2d 157, 509 P.2d 742 (1973); *State v. Stiltner,* 80 Wn.2d 47, 491 P.2d 1043 (1971); *State v. Malone,* 75 Wn.2d 612, 452 P.2d 963 (1969); *State v. Dimmer,* 7 Wn. App. 31, 497 P.2d 613 (1972).

In *State v. Stiltner, supra,* the court stated at page 54:

> [T]he constitutional principle that a denial of due process in cases involving the publicity of criminal matters may be found even without an affirmative showing of actual prejudice. Indeed, *where the circumstances involve a probability that prejudice will result,* it is to be deemed inherently lacking in due process. *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507

(1966); *Estes v. Texas,* 381 U.S. 532, 14 L. Ed. 2d 543, 85 S. Ct. 1628 (1965).

(Italics ours.) In *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966), the court stated at page 362:

Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances . . . But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. . . . But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. . . . Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.

The approved draft of the ABA Standards Relating to Fair Trial and Free Press § 3.2(c) (1968), adopted the standards of "reasonable likelihood" set forth in *Sheppard:*

A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved. A showing of actual prejudice shall not be required.

However, it has previously been noted that:

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and

scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd,* 366 U.S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961).

As previously noted, the ABA Standards Relating to Fair Trial and Free Press used the term "reasonable likelihood." In *State v. Stiltner, supra* at 54, our court used the term "probability that prejudice will result" as the standard by which to judge whether pretrial publicity requires a change of venue. We feel that the difference, if any, in the semantical definition of the terms is de minimis.

*Webster's Third New International Dictionary* (1969) defines "probable" as: "1c: that reasonably and fairly convincingly establishes something as true, factual, or possible but not with absolute conclusiveness." Probability is defined as "quality or state of being probable"; and likelihood as "probability."

During oral argument before this court, counsel advised that the trial judge conferred with representatives of the news media after the initial news reports. Apparently this conference had some effect, because the content of the news reports after the defendant's arrest no longer contained evidentiary matters, but confined itself strictly to the procedural aspects of the case as it progressed through the trial court once the defendant was returned from the state of Minnesota.

The recital by the news media of the detailed evidentiary facts involving the victim, the crime, and the defendant; the categorization of the defendant as "the robber"; and the reference to the defendant's past criminal record are violative of the bench-bar-press guidelines for reporting criminal

proceedings. See attached appendix. Had those reports continued beyond the initial reporting stage, we would have been compelled to hold that they were within the framework of *State v. Stiltner, supra.* However, the voir dire examination indicates no difficulty in obtaining jurors; at best five were challenged for cause. The defendant does not indicate he felt inhibited by the peremptory challenges alloted him nor did he exhaust them in the selection of the jury. We further note that while these articles were published principally in the month of November 1972, the trial was held in March of 1973.

Utilizing the criteria set forth in *State v. Crudup,* 11 Wn. App. 583, 524 P.2d 479 (1974), we note the following: (1) While the content of quoted articles may be such as to inflame the reader, it is also borne out by the testimony; (2) The newspapers apparently are weeklies, as contrasted with dailies, and the content of articles subsequent to those quoted above was limited to procedural matters; (3) Over 3 months elapsed from the time of dissemination of the quoted article to the date of trial; (4) and (5) No difficulty apparently was encountered in the selection of a jury due to the familiarity of the prospective jurors with the articles or broadcasts or their resultant effect; (6) There were minimal challenges either for cause or by way of the peremptory challenge in selection of the jury; (7) While initial articles were released by the sheriff, to a degree which could not be commended, there is no showing of any resultant effect upon potential veniremen; (8) and (9) While the population of the area from which the venire is drawn is small in comparison with the population of the state, there again is no evidence that the public was unduly aroused by the resultant publicity even in view of the severity of the charges.

Assuming the informal poll taken by defense counsel more than 2 months before trial is valid, 18 of the 40 persons polled formed an initial opinion of defendant's guilt. This is not to say that that opinion could not have

been set aside, *Irvin v. Dowd, supra,* nor is there any evidence that it could not have been or was not set aside in the event any of those people were called to serve upon the jury.

We do not find the existence of a "probability of prejudice" as contemplated by *State v. Stiltner, supra.* The trial court did not abuse its discretion in denying the motion for change of venue.

■ Defendant next contends a pretrial photographic identification utilized by the law enforcement agency was improper. When the officers went to defendant's home after the commission of the crime, they obtained a family picture from the stepson, made a negative, "cropped" defendant's picture therefrom, and placed it in a lineup along with six other photographs of other individuals obtained from the Spokane sheriff's office. This string of photographs was shown to the victim, from which she identified the defendant. Each of the photographs used was of an individual who exhibited facial qualities, and hair style and color, similar to that of defendant. The pictures were all of similar size and shape and were attached in line on a card. We do not find the identification procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968); *State v. Nettles,* 81 Wn.2d 205, 500 P.2d 752 (1972).

Thirdly, defendant complains that a prosecuting witness testified to a conversation had with the defendant prior to the commission of this offense, which was so prejudicial that it permeated the defendant's right to a fair trial. The witness had been cautioned, at the defendant's request, prior to testifying, that she should not relate any part of the conversation in which the defendant told her he was going to the penitentiary. In response to a question by the prosecutor as to the nature of the conversation, she proceeded to relate the conversation and concluded "he said that he would probably be going to the joint after the first — . . . ." Defendant immediately objected, the court sus-

tained the objection, instructed the jury to disregard the statement and ordered that it be stricken from the record.

We do not perceive that the prosecuting attorney, contrary to compliance with the defendant's request, in any way attempted to put this information before the jury. He had every reason to expect that she would render testimony without mentioning the penitentiary, even in a colloquial sense. Unquestionably, the defendant did utilize the term in the conversation with the witness. It was in an act of caution that the court concurred in the defendant's request to strike the witness' testimony. Under these circumstances, there being only one brief statement, the jury having been instructed to disregard the statement, and the statement, a colloquial expression not shown to be commonly understood to refer to the penitentiary, the comment, if error at all, was harmless error. *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967).

Judgment is affirmed.

GREEN, C.J., and McINTURFF, J., concur.

Petition for rehearing denied August 7, 1974.

Review denied by Supreme Court October 11, 1974.

APPENDIX

Principles

1. The News Media have the right and responsibility to print the truth. A free and responsible news media enhances the administration of justice. Members of the Bench and Bar should, within their respective codes of conduct and professional responsibility cooperate with the news media in the reporting of the administration of justice.

2. Parties to litigation have the right to have their causes tried fairly by an impartial tribunal. Defendants in criminal cases are guaranteed this right by the Constitutions of the United States and the various states.

3. No trial should be influenced by the pressure of publicity from news media nor from public clamor, and lawyers and journalists share the responsibility to prevent the creation of such pressures.

4. All news media should strive for objectivity and accuracy. The public has a right to be informed. The accused has a right to be judged in an atmosphere free from undue prejudice.

5. The news media recognizes the responsibility of the judge to preserve order in the court and to seek the ends of justice by all those means available to him.

6. Decisions about handling the news rest with editors, but in the exercise of news judgments the editor should remember that:

(a) An accused person is presumed innocent until proven guilty.

(b) Readers and listeners and viewers are potential jurors.

(c) No person's reputation should be injured needlessly.

7. The public is entitled to know how justice is being administered. However, no lawyer should exploit any medium of public information to enhance his side of a pending case. It follows that the public prosecutor should avoid taking unfair advantage of his position as an important source of news; this shall not be construed to limit his obligation to make available information to which the public is entitled.

8. Proper journalistic and legal training should include instruction in the meaning of constitutional rights to a fair trial, freedom of press, and the role of both journalist and lawyer in guarding these rights.

GUIDELINES FOR THE REPORTING OF CRIMINAL PROCEEDINGS

The proper administration of justice is the responsibility of the judiciary, bar, the prosecution, law enforcement personnel, news media and the public. None should relinquish its share in that responsibility or attempt to override or regulate the judgment of the other. None should condone injustices on the ground that they are infrequent.

The greatest news interest is usually engendered during the pretrial stage of a criminal case. It is then that the maximum attention is received and the greatest impact is made upon the public mind. It is then that the greatest danger to a fair trial occurs. The bench, the bar and the news media must exercise good judgment to balance the possible release of prejudicial information with the real public interest. However, these considerations are not necessarily applicable once a jury has been empaneled in a case. It is inherent in the concept of freedom of the press that the news media be free to report what occurs in public proceedings, such as criminal trials. In the course of the trial it is the responsibility of the bench to take appropriate measures to insure that the deliberations of the jury are based upon what is presented to them in court.

These guidelines are proposed as a means of balancing the public's right to be informed with the accused's right to a fair trial before an impartial jury.

1. It is appropriate to make public the following information concerning the defendant:

(a) The defendant's name, age, residence, employment, marital status, and similar background information. There should be no restraint on biographical facts other than accuracy, good taste and judgment.

(b) The substance or text of the charge, such as complaint, indictment, information or, where appropriate, the identity of the complaining party.

(c) The identity of the investigating and arresting agency and the length of the investigation.

(d) The circumstances immediately surrounding an arrest, in-

cluding the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of items seized at the time of arrest.

2. The release of certain types of information by law enforcement personnel, the bench and bar and the publication thereof by news media generally tends to create dangers of prejudice without serving a significant law enforcement or public interest function. Therefore, all concerned should be aware of the dangers of prejudice in making pretrial public disclosures of the following:

(a) Opinions about a defendant's character, his guilt or innocence.

(b) Admissions, confessions or the contents of a statement or alibis attributable to a defendant.

(c) References to the results of investigative procedures, such as fingerprints, polygraph examinations, ballistic tests, or laboratory tests.

(d) Statements concerning the credibility or anticipated testimony of prospective witnesses.

(e) Opinions concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial.

Exceptions may be in order if information to the public is essential to the apprehension of a suspect, or where other public interests will be served.

3. Prior criminal charges and convictions are matters of public record and are available to the news media through police agencies or court clerks. Law enforcement agencies should make such information available to the news media after a legitimate inquiry. The public disclosure of this information by the news media may be highly prejudicial without any significant addition to the public's need to be informed. The publication of such information should be carefully reviewed.

4. Law enforcement and court personnel should not prevent the photographing of defendants when they are in public places outside the courtroom. They should not encourage pictures or televising nor should they pose the defendant.

5. Photographs of a suspect may be released by law enforcement personnel provided a valid law enforcement function is served thereby. It is proper to disclose such information as may be necessary to enlist public assistance in apprehending fugitives from justice. Such disclosure may include photographs as well as records of prior arrests, and convictions.

6. The news media are free to report what occurs in the course of the judicial proceeding itself. The bench should utilize available measures, such as cautionary instructions, sequestration of the jury and the holding of hearings on evidence after the empaneling of the jury, to insure that the jury's deliberations are based upon evidence presented to them in court.

7. It is improper for members of the bench-bar-news media or law

enforcement agencies to make available to the public any statement or information for the purpose of influencing the outcome of a criminal trial.

8. Sensationalism should be avoided by all persons and agencies connected with the trial or reporting of a criminal case.